# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### August 4, 2015 Session

## STATE OF TENNESSEE v. ALVIN STEWART

### Appeal from the Criminal Court for Shelby County
### No. 13-01980     John W. Campbell, Judge

---

### No. W2014-01517-CCA-R3-CD  -  Filed September 25, 2015

---

The defendant, Alvin Stewart, was convicted by a Shelby County Criminal Court jury of aggravated rape, a Class A felony, aggravated assault, a Class C felony, and domestic assault, a Class A misdemeanor.  The trial court merged the domestic assault conviction into the aggravated assault conviction and sentenced the defendant to twenty years at 100% for the aggravated rape conviction and to six years at 30% for the aggravated assault conviction, to be served concurrently.  On appeal, he argues that the evidence is insufficient to sustain his convictions.  After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which ROGER A. PAGE and ROBERT H. MONTGOMERY, JR., JJ., joined.

James E. Thomas, Memphis, Tennessee (on appeal); Stephen C. Bush, District Public Defender; and Constance J. Barnes, Assistant Public Defender (at trial), for the appellant, Alvin Stewart.

Herbert H. Slatery III, Attorney General and Reporter; Tracy L. Alcock, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Carla L. Taylor and Glenda Adams, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

On February 10, 2013, the defendant assaulted the victim, who was his live-in fiancée, when she returned home after driving eleven hours on her job as an over-the-road truck driver.  On April 30, 2013, a Shelby County Grand Jury returned a four-count

indictment against the defendant, charging him with aggravated rape, aggravated assault, domestic assault, and cruelty to animals. The jury acquitted him of the animal cruelty charge.

## State's Proof

The victim testified that she first met the defendant in March 2010 when they both worked as truck drivers at the same company and started dating. She said that initially their relationship was "good" but subsequently became "chaotic," with the couple often arguing "about the way [the defendant] wanted [the victim] to be quiet and let him finish what he had to say and then [the victim] was allowed to speak." The defendant also argued with her when she received phone calls from her brother because he believed she was talking to a boyfriend. The victim said the defendant did not like her dog and was jealous of the dog, telling the victim that she loved her dog more than him. They broke off their relationship in April 2011 but got back together in February or March 2012 and became engaged.

The victim said that in February 2013 she and the defendant were living together but that she had started having doubts as to whether she wanted to marry him. They were both still employed as truck drivers but for different companies. They made plans for both of them to be home the weekend of February 9-10, 2013, so they could spend time together. The victim said she drove for eleven hours on February 9 and arrived home between 10:30 and 11:00 p.m. The defendant was still up when she got home, and she sat down on the couch and dozed off because she was exhausted. She later woke up, went upstairs to their bedroom, put on her nightgown, and lay across the bed. The defendant then came upstairs and wanted to be intimate, but she told him no because she was tired. The defendant, who was not happy, went downstairs, came back upstairs, flipped the light on, went through the closet, and kept repeating this process as the victim was trying to sleep.

The victim said that she heard her car starting, ran downstairs, opened the door, and asked the defendant where he was going with her car. The defendant came back inside the residence, and they started arguing. The defendant's "whole expression in his face changed," causing the victim to back away from him. The defendant then grabbed the victim by her throat, hit her, and threw her into the wall, telling her to "shut the f*** up." The victim fell down, and the defendant got on top of her and started hitting her in the face, further loosening her already loose tooth. The defendant told her he would make her be quiet and then choked her until she lost consciousness, causing her to urinate on herself. When the victim regained consciousness, she crawled up the stairs to the bedroom to get her phone but could not get it to work. The defendant then came upstairs as her dog was barking, and she begged the defendant not to hurt her any more. The

2

defendant told her to get her "mother****** ass over here," and when he touched her, she passed out again. When she awakened, she was on the bed and her dog was barking and "going after" the defendant. The defendant then slammed her dog into a wall, and the dog began yelping. The victim said she knew her dog was hurt, but she could not afford to take her to a veterinarian to be examined.

The defendant then told the victim he wanted to talk about what had happened, and they went downstairs to the living room. The defendant asked the victim if she wanted to go to the hospital, and she replied, "[W]ell, if I go to the hospital and they see me in my condition, do you think I'm going to lie to them?" The defendant then apologized for his actions and told the victim she "made him do it because all [she] had to learn was listen and this wouldn't have happened if [she] had listened to what he had to say and . . . learned how to be quiet and shut [her] mouth." The victim said she and the defendant talked for hours, and she told the defendant she no longer wanted to marry him. The defendant then told the victim she was "[his] woman," stood up, and started removing his clothes. The victim ran to the kitchen trying to get away from the defendant because "he wanted to have sex." The victim told the defendant, "[N]o, I'm not doing this. I said no, you're not going to do this to me. No." The defendant kept coming after her, and they tussled back onto the couch. The victim said as she was fighting with the defendant, he bit her arm and ripped off her underwear. The defendant tried to penetrate her vagina with his penis but could not. The victim said she repeatedly begged the defendant not to rape her. The defendant then forced her upstairs, pushed her down on the bed, and told her, "[Y]ou better not mother****** move like that." After the defendant unsuccessfully tried to penetrate her vagina again, he lubricated himself, got on top of the victim, and held her by her throat. He then flipped her over and penetrated her vagina as she was lying on her stomach, ejaculating inside her.

The victim said she was "numb" after the assault, and the next thing she remembered was talking to the defendant downstairs on the couch. The victim told the defendant if he stayed at the residence, she was going to call the police. The defendant then gathered his belongings and left. The victim called a friend and told her what had happened. Her friend told her to call the police, but she was afraid to do so and "wasn't thinking straight." The victim called another friend and told him what had happened, and he called the police on her behalf.

The victim said that when the police arrived, she told them what had happened, and a female officer subsequently arrived to help "calm [her] down." The victim then went to the police station, where she gave a statement, and to the rape crisis center, where she was examined. The victim acknowledged that initially she did not want to prosecute the defendant because she "didn't want to ruin his career" and believed that the assault was her fault. However, after receiving counseling, the victim realized it was not her

3

fault. The victim said that she was distraught, confused, and scared when she gave her statement to the police and that she "just signed the paper" without reading it. She acknowledged that she told the police she did not want the defendant to go to jail but receive counseling for his anger issues instead. The victim said she sustained bruising on her face, neck, shoulder, back, and buttocks and a bite mark on her arm and identified photographs depicting her injuries.

Officer Kcbena Cash of the Memphis Police Department testified that he responded to a disturbance call at 9:22 a.m. on February 10, 2013, at the defendant and victim's residence. The victim, who was "obviously shaken up" and crying, allowed Officer Cash inside the residence where he noticed a wall by the staircase that was "kind of caved in and it was pretty fresh." He said that he knew the wall was freshly caved in because of the paint chippings at the bottom. As Officer Cash started up the stairs to check to see if anyone else was present, the victim told him to watch his step because she had urinated on the floor in that area. Upstairs, Officer Cash observed that the bedroom was in disarray as if a struggle had occurred. The victim told him she had been raped, and Officer Cash called for a female officer to come to the scene.

On cross-examination, Officer Cash said that the victim reported to him that she was awakened at 3:00 a.m. and that the defendant forced her arm behind her back, forced her to the couch in the downstairs living room, tore off her panties, punched her on the cheek until she cooperated with him, had sexual intercourse with her while holding her down on the couch, forced her off the couch and threw her into a wall by the stairs, choked her while she was lying on the floor, which caused her to urinate on herself, forced her up the stairs to the bedroom and threw her across the bed, choked her again as he had sexual intercourse with her a second time, threatened to kill her if she told anyone what had happened, removed her torn panties from the living room floor, and then left the residence.

Officer David Galloway of the Memphis Police Department testified that he responded to the scene of the crime at 10:45 a.m. on February 10, 2013. He took photographs of the scene and the victim's injuries and collected into evidence the victim's nightgown and bedding.

Memphis Police Officer Angela Collins testified that she was called to the crime scene to transport the female victim to the rape crisis center. En route to the rape crisis center, the "hysterical" victim told Officer Collins that the defendant had awakened her earlier that morning and wanted to have sex. When the victim told him "no," the defendant choked her, forced her against the couch, ripped off her underwear, and forced her to open her legs. The victim also said that the defendant had hit her more than once in the face, forced her upstairs, and threw her dog against a wall.

4

Tammy Keough, a nurse examiner at the Memphis Sexual Assault Resource Center, testified that she examined the victim on February 10, 2013. The victim was very upset, crying, and very tense and reported that her fiancé had beaten and sexually assaulted her. A rape kit was collected and sent to the Tennessee Bureau of Investigation ("TBI") for testing. Nurse Keough's examination of the victim revealed contusions to her right and left jaw, abrasions on the back of her neck and shoulder, multiple abrasions and contusions on the front of her neck, a laceration to her left earlobe, bruising on her lips, bruising and abrasions on both arms, a round area consistent with a bite mark on her right forearm, purple bruising and a laceration on her left buttock, bruising on her right buttock and both legs, swelling and bruising on her left ankle, and a loose tooth. She said the victim's injuries appeared to be "very new" and estimated they were inflicted within twenty-four hours of her examination. While the victim did not have any vaginal injuries, Nurse Keough noted that less than ten percent of the victims examined at the sexual assault center had such injuries.

Robert Durham, a criminal investigator with the Shelby County District Attorney General's Office, testified that he collected a DNA sample from the defendant, which was sent to the TBI.

TBI Special Agent Donna Nelson testified that she was a crime laboratory regional supervisor and that the TBI received the victim's sexual assault kit and the defendant's DNA sample for testing. The vaginal swabs collected from the victim revealed the presence of sperm, and the DNA profile obtained after testing was consistent with the mixture of at least two individuals. The major contributor profile matched the defendant, and the minor contributor profile was consistent with the victim. Special Agent Nelson noted that the probability of the profile belonging to anyone other than the defendant "exceeded the world's population."

**Defendant's Proof**

The victim, recalled by the defense, testified that she gave a handwritten and a typed statement on February 11, 2013, which were admitted as exhibits.

The defendant testified that he did not rape or assault the victim and denied throwing her dog into a wall. He said that the victim called him on February 9, 2013, and told him she had fallen out of her truck. He arrived home from his truck driving job later that evening, and the victim subsequently arrived. The victim showed him the injuries from her fall, including bruising on her buttock, hip, and arm and a scratch on her back. The defendant recalled another incident where the victim had called him, saying she had knocked out a tooth while operating her truck. Later that evening, around 7:30-8:00 p.m.,

5

he left to go pick up some food for their dinner and returned home about an hour later. After they ate dinner, they went upstairs to bed and had sex twice. The defendant said he then went to sleep and woke up between 1:00 and 2:00 a.m. He went downstairs to check on his clothes in the dryer and heard the victim's phone receiving text messages in rapid succession. He began reading the text messages and discovered "a booty call" from a man named Summerall, as well as nude photographs of the victim. He said there were several text messages between the victim and Summerall, professing their love for each other. The defendant said he felt "[h]urt, dumbfounded, betrayed" by the text messages.

The defendant said he then went upstairs and woke up the victim to confront her about the text messages. The victim denied knowing Summerall, and when the defendant showed her the text messages, the victim "went ballistic," hitting, punching, kicking, and chasing the defendant around the room trying to get her phone away from him. He denied seeing the victim's dog or hearing the dog bark. He left the bedroom to go downstairs, with the victim "right on [his] he[e]ls." He told the victim, "[F]*** your phone, b****," and the victim pushed him, causing his head, shoulder, and hand to hit the wall by the stairs. The defendant said the fall caused a lump on his head which turned into a mole. The defendant got up and told the victim if she put her hands on him again, he would "knock the sh**" out of her. According to the defendant, the victim provoked him and told him to hit her, but he denied doing so. As he was walking toward the door to go outside to "cool off," the victim spat on him twice. The defendant turned around and "flinched at" the victim. The victim ran to the side of the couch, and realizing he only had on his underwear, the defendant went upstairs and got dressed.

The defendant said he then went outside and sat in his truck to clear his head. He put some alcohol on the lump on his head. He decided that his relationship with the victim was over and went back inside the house to gather his belongings. The victim was sitting in the floor, crying, and started apologizing to him, but he told her she had cheated on him. The victim followed him through the house as he packed his clothing and told him he was not going to leave her. He finished packing his belongings, gave the victim her key back, and asked for the engagement ring back. He said he had to "wrestle" the ring off the victim's finger but denied hitting or choking her. The defendant admitted he had received training in fighting and had been an amateur boxer.

## ANALYSIS

The defendant argues that the evidence is insufficient to support his convictions for aggravated rape and aggravated assault, asserting that the victim provided different versions of the incident and that there was no independent forensic evidence that he committed the crimes.

6

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Tennessee Code Annotated section 39-13-502 defines aggravated rape as follows:

> (a) Aggravated rape is unlawful sexual penetration of a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances:

(1) Force or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon;

(2) The defendant causes bodily injury to the victim;

(3) The defendant is aided or abetted by one (1) or more other persons; and

(A) Force or coercion is used to accomplish the act; or

(B) The defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless.

A person commits aggravated assault when he or she:

(A) Intentionally or knowingly commits an assault as defined in § 39-13-101, and the assault:

(i) Results in serious bodily injury to another;

(ii) Results in the death of another;

(iii) Involved the use or display of a deadly weapon; or

(iv) Was intended to cause bodily injury to another by strangulation or bodily injury by strangulation was attempted; or

(B) Recklessly commits an assault as defined in § 39-13-101(a)(1), and the assault:

(i) Results in serious bodily injury to another;

(ii) Results in the death of another; or

(iii) Involved the use or display of a deadly weapon.

Tenn. Code Ann. § 39-13-102(a)(1).

Viewed in the light most favorable to the State, the evidence showed that the defendant attacked the victim after she refused his sexual advances, hitting her, throwing

her into a wall, and choking her until she lost consciousness. The victim testified that the defendant subsequently bit her arm, ripped off her underwear, got on top of her, held her by the throat, turned her over, and penetrated her vagina as she was lying on her stomach. The victim said her injuries included bruising on her face, neck, shoulder, back, and buttocks and a bite mark on her arm. Officers Cash and Collins testified that the victim was crying hysterically when they arrived on the scene, and Officer Cash said that a wall near the staircase was freshly caved-in and that the upstairs bedroom was in disarray as if a struggle had taken place. The victim reported to both officers that she had been raped and assaulted by the defendant. Nurse Keough testified that her examination of the victim at the sexual assault resource center revealed numerous contusions and abrasions to the victim's face, neck, and shoulder; a laceration to her left earlobe; bruising and abrasions on her lips, arms, buttocks, and legs; a round area consistent with a bite mark on her right forearm; and a loose tooth. She said the victim's injuries appeared to be "very new" and estimated they were inflicted within twenty-four hours of her examination. TBI Special Agent Nelson testified that her testing confirmed the presence of sperm on the vaginal swabs collected from the victim, and the major contributor DNA profile obtained from the swabs matched the defendant. From all of this, we conclude that the evidence is sufficient for a reasonable trier of fact to find that the defendant committed aggravated rape and aggravated assault.

## CONCLUSION

Based on the foregoing authorities and reasoning, the judgments of the trial court are affirmed.

_____
ALAN E. GLENN, JUDGE

9